Matter of Angelica CC. v Ronald DD. (2023 NY Slip Op 01215)

Matter of Angelica CC. v Ronald DD.

2023 NY Slip Op 01215

Decided on March 9, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:March 9, 2023

532270 533922
[*1]In the Matter of Angelica CC., Respondent,
v
Ronald DD., Appellant. (And 12 Other Related Proceedings.)

Calendar Date:January 18, 2023

Before:Egan Jr., J.P., Lynch, Aarons, Ceresia and Fisher, JJ.

Law Offices of Theresa M. Suozzi, Esq., Saratoga Springs (Theresa M. Suozzi of counsel), for appellant.
Gordon, Tepper & DeCoursey, LLP, Glenville (Jennifer Powers Rutkey of counsel), for respondent.
Veronica Reed, Schenectady, attorney for the child.

Lynch, J.
Appeals (1) from an order of the Family Court of Schenectady County (Jill S. Polk, J.) entered September 29, 2020, which, among other things, granted petitioner's application, in a proceeding pursuant to Family Ct Act article 6, to hold respondent in willful violation of a prior order of custody, and (2) from an order of said court, entered June 25, 2021, which granted petitioner's motion for an award of counsel fees.
Petitioner (hereinafter the mother) and respondent (hereinafter the father) are the unmarried parents of a child (born in 2016). Pursuant to an order of custody entered in March 2017 on consent (hereinafter the prior order), the parties had joint legal and shared physical custody of the child, with a schedule specifying the times for a daily exchange. Between October 2, 2017 and December 14, 2018, the mother filed 10 separate enforcement petitions against the father for repeated disruptions of the custody exchanges and other asserted violations of the prior order; in some of those petitions she also sought to modify terms of the prior order. In May 2019, the father filed a petition to modify the prior order to essentially change the custodial schedule. A hearing was held over a period of 13 non-consecutive days from April 19, 2018 through December 5, 2019.[FN1] On September 20, 2020, Family Court granted four of the mother's enforcement petitions, finding the father in willful violation of the prior order, and awarded the mother sole legal and primary physical custody of the child, with parenting time to the father. In a separate order issued in June 2021, the court awarded the mother $32,000 in counsel fees. The father appeals both orders.
With respect to the enforcement petitions, the mother's burden was to "establish, by clear and convincing evidence, that there was a lawful court order in effect with a clear and unequivocal mandate, that [the father] had actual knowledge of the order's terms" and that his willful actions impaired her rights under the prior order (Matter of Carl KK. v Michelle JJ., 175 AD3d 1627, 1628 [2019]). Upon reviewing a determination on such a petition, we defer to Family Court's credibility assessments and factual findings, and its decision will not be disturbed absent an abuse of discretion (see id.). As for modifying the prior order of custody, there must be a showing of a change in circumstances, then proof that the child's best interests would be served by modifying the order as requested (see Matter of William V. v Christine W., 206 AD3d 1478, 1479 [3d Dept 2022]). In their respective petitions, both parties requested a modification of the prior order which, in pertinent part, set up a baseline schedule requiring a daily exchange of the child at 6:30 a.m. and 4:30 p.m. on weekdays and 4:00 p.m. on weekends. It is manifest from this record that the timing and frequency of these transitions was too disruptive for all concerned.
In our view, Family Court's order finding willful violations on the father's [*2]part and awarding sole custody to the mother is supported by a sound and substantial basis in the record. A pattern emerges from this record in which the father was persistently late in returning the child, but always on time to pick the child up. The problems that ensued, however, were not merely temporal. The mother testified, and the videos received into evidence illustrate, that once he arrived to return the child, the father would place the child in his car seat but then persist in an extended goodbye. In doing so, he would disregard the mother's request to conclude the drop-off so that she could leave. The videos reveal that the father's behavior was overly assertive, disrespectful to the mother, argumentative and, in every sense, taunting and bullying. During the May 1, 2019 exchange, the father, who displayed a short fuse, began to scold the mother in a loud voice, prompting the three-year-old child to say, "[n]o daddy, don't talk to mommy that way." For her part, the mother maintained her composure. At the conclusion of an exchange on May 6, 2019, during which the father bizarrely encouraged the child to use vulgar language, he took the child's shoes because the mother did not bring the child's hat — apparently, in his view, as a form of punishment. On several occasions, after unwarranted delay during the exchange, the father walked away from the car leaving the rear passenger door next to the child open. The mother testified that she remained in the car because she was fearful of the father — a valid concern given his volatile behavior. It is particularly telling that these exchanges occurred during the course of the hearing and the father knew that they were being recorded.
The record further demonstrates that the father disregarded the prior order with respect to daycare. The mother worked from home and arranged to have the child attend daycare in four-hour increments. Pertinent in this regard, the prior order required "the parents [to] provide each other with the right of first refusal to care for the child in the event child care is required for more than [four] hours." The court found that the father would not only show up at daycare, disrupting the child's routine, but also inappropriately remove the child from daycare, undermining the mother's efforts to enhance the child's socialization with other children.
With respect to the child's medical care, there are numerous instances in the record where the father disregarded both the mother's and the pediatrician's decisions as to appropriate treatment. Not to be overlooked is the fact that the mother was a medic in the military, where she served for 12 years. For her part, the pediatrician described the mother as "a wonderful mother," attentive to the child's medical needs. In contrast, the pediatrician acknowledged that there were medical visits where there was tension between herself and the father.
At the beginning of these proceedings, Family Court ordered a forensic custody [*3]evaluation, which Jacqueline Bashkoff — a licensed psychologist appointed by the court — described as an assessment of comparative parental fitness. Bashkoff's March 23, 2018 report was received into evidence on the first day of the hearing, without objection, and the parties declined the opportunity to cross-examine her. Importantly, Bashkoff observed that the father presented with limited parental resources, limited insight and poor judgment, noting that he induces conflict. She found the mother comparatively and significantly more rational and reasonable. Noting that the parties were unable to communicate, Bashkoff concluded that the only viable custodial plan was to award sole custody to the mother. The court observed that Bashkoff's findings "confirm and match those of the [c]ourt." The record supports this assessment.
With respect to the custody modification, there is no dispute that the record demonstrates a change in circumstances warranting a best interests review (see Matter of William V. v Christine W., 206 AD3d at 1479). For the reasons outlined above, we conclude that Family Court duly exercised its discretion in awarding sole custody to the mother. There is an overriding sense in this record that the father is focused more on his own dominance over the mother and the child than the best interests of the child, while the mother is genuinely attuned to the child's needs. The court fashioned a more workable parenting schedule, according the father parenting time on alternate weekends from Friday at 6:00 p.m. until Sunday at 6:00 p.m., with alternate holidays, summer vacation time and reasonable telephone access. To avoid controversy, the court understandably directed the exchanges to occur at a Stewart's Shop across the street from the Village of Scotia Police Station. We find that directive prudent.
We now turn to Family Court's order awarding the mother $32,000 in counsel fees. In the September 2020 decision and order, the court determined that the mother was entitled to submit a request for counsel fees "[b]ased on the [c]ourt's findings of willful violation[s]." The mother submitted an application in October 2020, including an affidavit from counsel together with a copy of the retainer agreement and itemization of services rendered from January 2019 through February 3, 2020 in the amount of $49,737.[FN2] The mother was accorded a courtesy credit of $6,978 and had paid $38,696.10 at the time of the application. Taking into account the parties' respective financial status, including earnings and assets,[FN3] and offsetting the credit, the court determined to award $32,000, representing 75% of the counsel fees actually charged.
Pursuant to Domestic Relations Law § 237 (b), a court may award counsel fees to a party seeking to enforce a custody order "as, in the court's discretion, justice requires, having regard to the circumstances of the case and of the respective parties" (see DeCabrera v Cabrera-Rosete, 70 NY2d 879, 881 [1987]; Gordon[*4]-Medley v Medley, 160 AD3d 1146, 1148-1149 [3d Dept 2018]). Judiciary Law § 773 provides further authority for the award of counsel fees based on the father's willful violations (see Matter of Khan v Khan, 140 AD3d 1252, 1254-1254 [3d Dept 2016]; Matter of Meier v Key-Meier, 36 AD3d 1001, 1004 [3d Dept 2007]). As discussed above, this matter was extensively litigated over a long duration, with Family Court ultimately finding that the father willfully violated the prior order on 21 separate and distinct occasions. In effect, the relative merit of the parties' positions strongly balances in favor of the mother (see Teaney v Teaney, 138 AD3d 1301, 1302-1303 [3d Dept 2016]). This litigation has proven costly to both sides. Even recognizing that the court overstated the father's 2019 income, based on all the circumstances presented, we cannot say the court abused its discretion in making the counsel fee award (see Gordon-Medley v Medley, 160 AD3d at 1149).
One final word is in order with respect to the attorney for the child's argument that neither party is entitled to an award of counsel fees because "the entity that delayed and protracted the litigation was [Family Court]" in disregarding the parties' efforts to settle the case on the first day of the hearing, and again in November 2018. Considering the rocky start of this hearing on April 19, 2018, this critique is somewhat understandable but ultimately without merit. That day, the hearing was scheduled to commence at 9:00 a.m., but did not get underway until 11:00 a.m. due to the late arrival of the mother's counsel. To his credit, counsel endeavored to both explain the reason for the delay (based on his personal medical event) and obtain a very short recess to finalize a settlement. Counsel for the father joined in the request. The court sharply declined and directed counsel to call his first witness.
We are mindful that trial courts must have broad discretion in controlling their calendars and the progress of a trial. At the same time, this record reflects inflexibility and impatience on the part of Family Court and the unfortunate loss of a potential opportunity to have settled this case before a single witness was called. That said, and as the court observed, the parties were in no way prevented from settling as the litigation progressed — they were just unable to do so. As for the November 2018 proceedings, the court properly allowed the parties a chance to place a settlement on the record, but that attempt collapsed when the father advised that he was dissatisfied with his counsel and requested an opportunity to retain new counsel. The court properly accommodated that request.
Egan Jr., J.P., Aarons, Ceresia and Fisher, JJ., concur.
ORDERED that the orders are affirmed, with costs.

Footnotes

Footnote 1: Sadly, part of the delay was due to the fact that the mother's attorney passed away in September 2018. At the next appearance on November 29, 2018, the father requested an opportunity to hire new counsel. When the trial resumed on March 28, 2019, both parties were represented by new counsel.

Footnote 2: This amount does not include the $9,482 paid by the mother to her initial law firm. In the September 2020 decision and order, Family Court granted the mother until October 16, 2020 to submit her counsel fees application, with the father having until October 30, 2020 to file his answering papers. In December 2020 — after having received the mother's October 2020 counsel fees application — Family Court advised the parties' attorneys that no answering papers had been received. In response, the father's attorney indicated that she had not been served with the mother's October 2020 application, prompting Family Court to extend the deadline to submit the father's answering papers to January 26, 2021. However, despite the extension, the father did not submit opposition papers pertaining to the mother's October 2020 application.

Footnote 3: We note that in 2019, the mother earned $76,000 while the father earned $85,565 — which Family Court misstated as $95,130.